UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 20-CR-80095-CANNON

UNITED STATES OF AMERICA

vs.

JAMES CLEARY,

    Defendant.
_____/

**MOTION FOR DOWNWARD VARIANCE**
**AND SENTENCING MEMORANDUM**

    COMES NOW, the Defendant, JAMES CLEARY, and in accordance with the decision in United States v. Booker, 543 U.S. 220 (2005), Kimbrough v. United States, 552 U.S. 85(2007), Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38(2007), Nelson v. United States, 129 S.Ct. 890 (2009) (per curiam), Spears v. United States, 555 U.S. 261 (2009) and 18 U.S.C. § 3553(a), files this Motion for Downward Variance and Sentencing Memorandum setting forth all of the factors and reasons this Court should consider before imposing a sentence in the above-styled case. The Defendant is hereby requesting this Court to vary from the advisory sentencing guidelines and impose a sentence that consists of no more than one year and a day in the Federal Bureau of Prison to be followed by supervised release. As the Court will come to understand, this type and amount of sentence is a sufficient but not greater than necessary sanction under the circumstances of this particular case.

    The court, in determining the particular sentence to be imposed, pursuant to 18 U.S.C. 3553(a) shall consider: (1) the nature of the circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (B) to afford adequate deterrence to criminal conduct; (C) To protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; Additionally, the court needs to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. An analysis of these §3553 factors, when viewed together in this case clearly warrants a downward variance from the advisory sentencing guidelines. A minimal term of imprisonment followed by a term of supervised release is not only sufficient, but reasonable and justified.

NATURE AND CIRCUMSTANCES OF THE OFFENSE

While the Defendant has been charged with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, the actual conduct that the Defendant knowingly participated in is limited to the contact he had with just the (3) three individual investors identified in the PreSentence Investigation Report. [PSR ¶31] While the total loss involving NIT is likely to have been large in scope, the Defendant is only being held responsible for $393,500. Of this amount, the Defendant earned approximately $134,000 in commissions from his wrongful conduct. Throughout the year that the Defendant worked for NIT, he had always worked by himself, never associating with the other co defendants or uncharged coconspirstors. The Defendant primarily met with Gary Smith, President and CEO of N.I.T., and Anthony Gedeon, lead scientist and product developer. Most of the time, the Defendant was not even at the NIT offices in Palm Beach Gardens and not aware of what others were raising. The Defendant was the "lone wolf" as he was often referred to during the course of the government's investigation. The Defendant never worked in the same office with nor did he "cold call" investors or use "fake names" like the other co defendants did. These circumstances place the Defendant in a somewhat different position than the others.

After the Defendant was barred by the Securities & Exchange Commission from selling securities back in September, 2016, he knew he should not have been involved with NIT or any other business entity in the capacity of raising capital. When he initially met with Gary Smith and was pitched on the product they were developing to protect against damaging radiation, his initial thought was that this was a great opportunity and some of his past clients would be interested as this may have been a way for them to regain some of their losses from the past. The Defendant also saw NIT as a long term opportunity for him to be part of the sales force that would market and sell the vests once the product was finalized.

The Defendant had researched the product and the industry thoroughly and even reached out to one of his previous investors who was a doctor to get his insight and opinion on the concept. If properly developed, the radiation vests would have application not only for physicians in surgery settings but pilots and in other industries where radiation, including Ultraviolet Light, X-Rays, and Gamma Rays are prevalent.  This type of product would have been a "game changer" for so many professions. Having been given the green light from his former investor, the Defendant, being shortsighted and not realizing the serious ramifications of violating his bar from the industry, decided to reach out to his other former investors and pitch the investment. The Defendant knew this was wrong. This very poor decision and his actions moving forward, has now cost the Defendant a world of trouble, including a felony conviction and potential loss of freedom. His involvement was in clear violation of his permanent bar and there is no excuse for his conduct. The total amount NIT received from the Defendant's investors was $393,500. Because the Defendant worked by himself and only solicited three investors, his commissions were not split with others, which apparently would have made it more difficult for the government to ascertain what he should be held responsible for. Because the other

co-defendants worked together as a team in obtaining funds from investors, there is a large amount of money that the co defendants are not being held accountable for which is reflected in lower loss amounts being attributable to them. [PSR ¶ 30]. This situation clearly inures to the benefit of the co defendants with regard to the guideline calculations and something the Court must consider in weighing relative culpability when it comes to loss amounts.

In furtherance of the Defendant's relevant conduct, the Defendant failed to disclose to his (3) three investors his permanent ban by FINRA and the Security & Exchange Commision. The Defendant also failed to disclose his commission structure with NIT, which estimated approximately 30% of the investment provided by his clients. The Defendant had represented that all investor money would be used to fund research, development and production of NIT's radiation protective products. All of these facts are consistent with the Factual Proffer that the parties entered into at the time of the plea. The Defendant knew at the time that these false misrepresentations were material and would have likely changed the course of his clients investment decisions. The Defendant has no one to blame for his actions in this case but himself. The Defendant is deeply saddened and remorseful for what he did and has learned a big lesson from this.

<u>HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

The Defendant is the father of three young children. Ryan, age 15, Dylan, age 13 and Fallyn, age 10. His children are the "apples of his eyes". His children give him great pride and a sense of being. The Defendant has been the breadwinner for the family since he got married in 2003. His wife does not currently work outside the home. She cares for the children during the day when they return from school, which is no easy task. The Defendant generally picks up when he gets home from work, spending time with his kids doing homework and taking them places to

buy supplies and things for school. The Defendant is also actively involved with his oldest son, Ryan, who plays baseball. The Defendant was a huge baseball fan when he was a kid and they both enjoy being together whether it is for just a practice or an actual game.

Since the inception of the case, after the Defendant surrendered and was released on pretrial release, the family has been going through difficult times. Not knowing his future or how his wife and children will survive if he is incarcerated has left the Defendant extremely anxious and unsettled. The Defendant prays that the Court finds justification in the statutory factors set forth in 3553(a) to support the grounds for a downward variance from the sentencing guideline range. The Defendant is not an evil or violent person. He is not mean spirited by any stretch of the imagination and if given the opportunity to sit down and converse with the Defendant, the Court would find him extremely courteous, polite and humorous at times. These are redeemable qualities that sometimes go unnoticed in these situations which breathe light into every human being, good and bad. The Defendant has always had good intentions to help people but in the past has become sidetracked, derailed and misguided. This case is no different. The Defendant violated a court order and misrepresented material information for which there are consequences.

The Defendant attends church quite regularly and constantly asks for forgiveness. The Defendant has volunteered in the past, even before this case began. The Defendant is hoping to turn his life around and has already taken steps in that regard. The Defendant is confident he can repay the restitution back to his investors in due time. The Defendant has been working in a legitimate fashion for the past couple of years since leaving NIT. The Defendant is currently positioned within the next couple of months to earn in excess of $200,000.00 per year. This salary is likely to continue for several years and if so, would allow the Defendant to pay a substantial portion of his earnings to the victims, making them whole. "[T]he need to provide

restitution to any victims of the offense." is an important factor for the Court to consider in imposing sentence. See 18 U.S.C. §3553(a)(7); see also, e.g., United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a nonincarcerated and employed defendant"); United States v. Peterson, 363 F. Supp. 2d 1060, 1061- 62 (E.D. Wis. 2005) (granting a variance so that the defendant could work and pay restitution). The victims in this case have stressed the need for restitution, and the Defendant has shown his willingness to provide it. A lengthy sentence consistent with the calculated guideline range would undoubtedly result in the Defendant's job opportunity being lost. This Court should seek to maximize, rather than eliminate the Defendant's ability to make the restitution the victims would want to receive.

     Incarcerating the Defendant for an extended period of time will undoubtedly result in the Defendant's job opportunity being lost and the prospect of repaying his victims in a short period of time would diminish significantly. A sentence that varies downward from the guideline range while imposing a minimal amount of prison time would not only help satisfy the need to reimburse the victims, but it would provide just punishment for the crime committed by this Defendant.

## **THE DETERRENT EFFECT**

     The Defendant falls within a criminal history category one.  Having been permanently banned in the securities industry and now having a felony conviction and having been through this criminal process involving this case will undoubtedly ensure that this type of conduct will never again be repeated by this Defendant. The stakes are already high enough in this case and the Defendant knows that if he were to find himself back before this or any court in the future, he

would be facing an exorbitant amount of time. Right now, any amount of jail time seems like a life sentence to the Defendant. The Defendant would never put himself in this situation again. The Defendant can comply with rules as he has been doing since his arrest in this case. Based upon the Defendant's personal characteristics and his current family dynamic, it is highly unlikely that he will ever be back before this Court again or involved in the criminal justice system in any way.

Although the specific numerical offense severity determined under the sentencing guidelines does not necessarily correlate with recidivism, the type of crime the offender committed does have some correlation with the risk of future crime. Offenders whose federal offense involved fraud were at the lowest of the group (34.2%), as compared to those convicted of firearms offenses who were most likely to be rearrested at (68.3%). See United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview. (2016)[1] It would appear that the Defendant has an even lower rate given his personal characteristics and family dynamic.

Additionally, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are

---

[1] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

those of the Institute of Criminology at Cambridge University. See <u>Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research</u> (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. <u>Id</u>. at 1. It examined the effects of changes to both the certainty and severity of punishment. <u>Id</u>. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." <u>Id</u>. at 2.

All of these statistics bode well for someone like the Defendant, who does not have a significant criminal history whatsoever. The low rate of recidivism, especially for someone like the Defendant is something the Court should consider in imposing a sentence that varies downward from the advisory guideline range. A minimum sentence of imprisonment followed by a period of supervised release clearly will afford adequate deterrence to criminal conduct by this Defendant. Under the facts and circumstances of this case, this type of sentence will also reflect the seriousness of the offense and provide just punishment and respect for the law.

## ADDITIONAL CONSIDERATIONS FOR THE COURT TO CONSIDER IN SUPPORT OF DOWNWARD VARIANCE

Whether the Court sustains or overrules the objections made to the PreSentence Investigation Report filed by the Defendant in this case, [DE 100], the Court may still vary downward from the advisory guideline range. Given the nature and circumstances of the Defendant's role in the offense and the loss attributed to only him, a downward variance to his single count of conviction is appropriate. As set forth in the authorities cited at the beginning of this memorandum, a sentence less than that advised by what this Court determines to be the applicable sentencing guideline range is appropriate through application of the § 3553(a) factors.

A sentencing court may not presume that a sentence within the applicable guidelines range is reasonable but added, "[t]he Guidelines are not only not mandatory on sentencing courts, they are not to be presumed reasonable." Nelson v. United States, 555 U.S. at 352. (emphasis added).

Based upon all that has been said, how the Court measures the Defendant should not be limited to his worst days and misjudgments. The court so eloquently explained in United States v. Adelson, 441 F.Supp.2d 506 (S.D.N.Y. 2006), that:

> But, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. The elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophers and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the "history and characteristics of the defendant."

While the advisory guideline range is a bare mathematical computation, it is far from perfect and should be viewed with some skepticism in certain cases. While the sentencing commission has identified factors that ought to be considered in sentencing an economic offender, (i.e. loss amount, complexity/sophistication, number of victims, the amount of the defendants personal gain and factors in Chapter Three relating to role in the offense), many of them interact and address similar concerns which result in a higher than expected range of punishment. The result is that many factors for which loss was previously a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself.  While the Defendant in this case was not a senior corporate officer who was committing large scale fraud, the point is that the cumulative effect of any guideline enhancements that may apply in this case, also permits this Court to consider this effect in justifying a downward variance at the time of sentencing. See Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After

Booker, 20 Fed. Sent. R. 167 (2008). (many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself.).

## VOLUNTARY SURRENDER IS APPROPRIATE IF COURT ORDERS INCARCERATION

The Defendant has complied with all of his conditions of supervised release. Title 18 U.S.C. §1343(a) gives the Court discretion to release a person awaiting execution of sentence if the Court finds by clear and convincing evidence that the person is neither likely to flee nor poses a danger to any person or the community. There is clear and convincing evidence that the Defendant will neither flee nor pose a danger to the community. The Court should exercise its discretion to permit Mr. Cleary to surrender. Being remanded into custody has adverse consequences for a defendant's Bureau of Prisons security level and, therefore, his designation. Bureau of Prisons Program Statement 5100.08 provides for "the subtraction of three points from the Security Point Total … when the judgment indicates the inmate was allowed to voluntarily surrender." Ch. 4, p 5. In other words, the Bureau of Prisons draws a positive inference from the Court's determination that the defendant is sufficiently trustworthy to surrender voluntarily. This inference can help a defendant serve a sentence in a lower security facility. Finally, the Defendant asks the Court to recommend that he serve any period of incarceration that may be imposed at a federal prison camp as close to the Southern District of Florida as possible.

**CONCLUSION**

For all of the foregoing reasons, the Defendant, James Cleary, respectfully requests this Honorable Court to vary downward from the advisory sentencing guideline range in this case and impose a minimum sentence of imprisonment followed by a period of supervised release. This type of sentence is sufficient, but not greater than necessary to achieve the mandates of sentencing.

Respectfully submitted by,

JONATHAN S. FRIEDMAN, P.A.
ATTORNEY FOR JAMES CLEARY
101 N.E. 3RD AVE.
SUITE 110
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE: (954) 713-2820
FACSIMILE: (754) 301-5109

/S/ Jonathan S. Friedman_____
JONATHAN S. FRIEDMAN, ESQ.
FLORIDA BAR NUMBER: 0973297

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 25, 2021, the undersigned attorney electronically filed the foregoing document with the Clerk of the Court, United States Attorney's Office, and other counsel of record, if any, using CM/ECF and has served same via U.S. Mail to those counsel(s) or individuals, if any, who are not authorized to receive electronically Notice of Electronic Filing.

/S/ Jonathan S. Friedman_____
JONATHAN S. FRIEDMAN, ESQ.